# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

---

Nº 16-CV-2385 (JFB)

---

TAMARI A. GARDNER,

Plaintiff,

VERSUS

CAROLYN W. COLVIN,
ACTING COMMISSIONER OF SOCIAL SECURITY,

Defendant.

---

## MEMORANDUM AND ORDER
August 8, 2019

---

JOSEPH F. BIANCO, Circuit Judge (sitting by designation):

Plaintiff Tamari A. Gardner commenced this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act on May 19, 2016, challenging the final decision of the Acting Commissioner of Social Security (the "Commissioner") denying plaintiff's application for Social Security disability benefits on March 22, 2016. An Administrative Law Judge ("ALJ") determined that plaintiff had the residual functional capacity to perform a full range of work at all exertional levels, with certain non-exertional limitations. The ALJ found that there were a significant number of jobs in the national economy that plaintiff could perform despite these limitations, and,

therefore, that plaintiff was not disabled. The Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.

Plaintiff now moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). The Commissioner opposes the motion and cross-moves for judgment on the pleadings. For the reasons set forth below, the Court denies plaintiff's motion for judgment on the pleadings, denies the Commissioner's cross-motion for judgment on the pleadings, and remands the case to the ALJ for further proceedings consistent with this Memorandum and Order.

## I. FACTUAL BACKGROUND

The following summary of the relevant facts is based upon the Administrative Record ("AR") developed by the ALJ. (ECF No. 5.) A more exhaustive recitation is contained in the parties' submissions to the Court and is not repeated herein.

### A. Personal and Education History

Plaintiff was born on May 24, 1993. (AR 53.) Up until the date plaintiff turned 18, she received child's disability benefits under Title XVI. (*Id*. at 90.)

Plaintiff attended Sewanhaka Central School District, where she completed the tenth grade. (*Id*. at 53-54, 255.) While in school, plaintiff attended special education classes. (*Id*. at 54.) More specifically, plaintiff participated in the Nassau BOCES Center for Community Adjustment ("CCA") program, which is an ungraded program. (*Id*. 255.) Plaintiff was placed in this program because she "requires special instruction in an environment with a smaller student-to-teacher ratio and minimal distractions in order to progress in achieving the learning standards." (*Id*. 366.) Plaintiff's class had a ratio of "6-1+1." (*Id*. 365.)

Sewanhaka Central High School District prepared Individualized Education Program ("IEP") reports for plaintiff while she was in attendance. (*Id*. 257.)

Plaintiff's IEP report states that plaintiff's cognitive levels/abilities were "below age/grade expectations" (*id*.), and that her social development levels/abilities were "significant[ly] delay[ed]" with respect to "peers and authority figures" (*id*. at 258). Plaintiff was exempt from learning a language other than English because her "disability adversely affects the ability to learn a language." (*Id*. at 368.)

Plaintiff's IEP report further provided that plaintiff had "social and emotional needs that should be addressed through special education," including that plaintiff had difficulty undertaking new or challenging tasks; lacked confidence in social relationships; and needed to develop problem-solving skills. (*Id*. at 367.) In addition, the IEP reported that plaintiff "has difficulty in her ability to engage in appropriate social behaviors, along with difficulty in reading decoding, reading comprehension, [and] math calculation, which interferes with participation in age appropriate activities." (*Id*. at 368.)

Plaintiff's 2008-2009 Annual Student Profile reported that, with respect to "Vocational / Transition Planning," plaintiff "has difficulty sustaining working on job tasks for the required amount of time," and that she "needs to increase the performance related skills in job/work settings (*e.g.*, adaptability, behavior/interactions, productivity, independent functioning)." (*Id*. at 380.) The annual profile further reported that, in the category of social development, plaintiff "generally demonstrates appropriate interactions with select authority figures" and "is aware of her personal feelings," but that plaintiff "needs to express her thoughts and feelings more appropriately"; "becomes anxious/stressed in social situations"; and "has difficulty expressing anger in an appropriate manner." (*Id*. at 381.)

On April 22, 2010, Sewanhaka Central High School District conducted a Psychological Re-Evaluation of plaintiff. (*Id*. at 508-10.) The evaluation noted that, when plaintiff entered the CCA program in September 2008, she "initially demonstrated difficulties engaging in positive peer interactions"; "was often angry, argumentative and threatening"; and "used inappropriate language and would threaten classmates with physical retaliation." (*Id*. at

509.) The evaluation further noted that plaintiff was participating "in a community work-site at Shop-Rite." (*Id*.)

The Psychological Re-Evaluation also reported the following WAIS-IV test scores for plaintiff: 72 for verbal comprehension; 67 for perceptual reasoning; 80 for working memory; 76 for processing speed; 67 for general ability; and a full scale IQ of 68. (*Id*. at 508.) Plaintiff's full scale IQ score was 74 in 2007. (*Id*.)

B. Relevant Medical History

In 2010, plaintiff received treatment for postpartum depression and bipolar disorder through the Federation Employment & Guidance Service ("FEGS"). (*Id*. at 288.) Plaintiff returned to FEGS for treatment in February 2012, where she had weekly psychotherapy sessions and monthly sessions with a psychiatrist for medication management purposes, detailed below.

1. Dr. Flavia Robotti

On March 26, 2012, plaintiff was evaluated by FEGS psychiatrist Flavia Robotti, M.D. ("Dr. Robotti"), who performed a Psychiatric Evaluation. (*Id*. at 441-49.) Dr. Robotti reported that plaintiff began feeling depressed at age twelve, when her father left her family; plaintiff was also depressed post-partum in 2010; plaintiff's mother had brought plaintiff to FEGS in 2010 for psychotherapy treatment, but would not consent to medicating plaintiff; plaintiff dropped out of FEGS one month later, after getting into a fight with her mother and moving out of her mother's house; and plaintiff "has continued to be depressed, irritable, with bouts of uncontrollable anger where she becomes verbally abusive." (*Id*. at 441.)

With respect to plaintiff's developmental history, Dr. Robotti reported that plaintiff was "slow in all developmental milestones";

had been diagnosed as learning disabled and emotionally disturbed since childhood; and attended a BOCES program until eleventh grade, when she dropped out after having her child. (*Id*. at 443.) Dr. Robotti also evaluated plaintiff's history of sexual and/or physical abuse or neglect, and reported that plaintiff was raped by her ex-boyfriend in 2007 and was physically abused by her child's father while plaintiff was pregnant. (*Id*.) Dr. Robotti further reported that plaintiff denied having any legal problems. (*Id*.)

In connection with plaintiff's mental status examination, Dr. Robotti reported plaintiff's behavior as appropriate (*id*. at 444); awareness/attention as alert (*id*.); attitude as cooperative (*id*.); emotional affect as constricted and labile (*id*. at 446; mood as anxious and irritable (*id*.); congruence of mood with situation and content as appropriate (*id*.); judgment as appropriate for age (*id*.); insight into her illness as appropriate for age (*id*.); impulse control as appropriate for age (*id*.); and noted that plaintiff experienced feelings of helplessness and hopelessness and suffered from sleep disturbances (*id*. at 444). Dr. Robotti also reported plaintiff's speech as slow; thought processes as "poverty of content"; and noted that plaintiff suffered from paranoid thinking (specifically with respect to her family turning against her). (*Id*. at 445.) Plaintiff denied suicidal ideations, but Dr. Robotti reported that plaintiff had high financial and social stressors. (*Id*.)

Dr. Robotti reported plaintiff's cognitive functioning as "good" with respect to orientation to time, place, and person; immediate retention and recall; and recent memory (in the past 24 hours). (*Id*. at 446.) Dr. Robotti reported plaintiff's cognitive functioning as "fair" with respect to remote memory; abstract versus concrete thought;

and cognitive ability.[1] (*Id.*) Dr. Robotti reported plaintiff's personality characteristics as argumentative and impulsive. (*Id*. at 447.)

At the end of the evaluation, Dr. Robotti reported that plaintiff "has always suffered from depression"; has a learning disability; and suffers from outbursts of anger "where she verbally abuses others[, but] denies physical violence." (*Id.*) Dr. Robotti, however, noted that plaintiff does not have aggressive impulses towards her daughter and that she has neither been treated with medication nor been hospitalized in the past.

Dr. Robotti diagnosed plaintiff with dysthymic disorder and assessed plaintiff's global assessment of function ("GAF") at a score of 45. (*Id*. at 448.) Dr. Robotti recommended that plaintiff be prescribed medication to alleviate depression and improve impulse control. (*Id*. at 449.)

Dr. Robotti evaluated plaintiff again on September 26, 2013. Dr. Robotti reported that plaintiff stopped all psychotropic medications ten months prior because she was pregnant, but noted that plaintiff had continued psychotherapy sessions. (*Id*. at 476.) Dr. Robotti further reported that plaintiff was suffering from dysthymic disorder, and that plaintiff's mood swings had become more prominent since her pregnancy. (*Id*.) Dr. Robotti noted that plaintiff experienced decreased sleep; increased appetite; low energy; and anxiety, and that plaintiff wanted to resume her medication. (*Id*.)

Dr. Robotti conducted a mental status examination of plaintiff, reporting plaintiff's speech as normal; attitude as cooperative; behavior as appropriate; psychomotor activity as appropriate; and affect as broad ranged. (*Id*. 477.) Dr. Robotti further

reported that plaintiff did not have a depressed mood, was not manic, had normal thought processes, and had realistic thought content (*i.e.*, plaintiff had realistic concerns about the future and wanted her own apartment). (*Id.*) Plaintiff had no psychosis, suicidality, or homicidiality, and Dr. Robotti reported plaintiff's recent and remote memory, concentration/attention span, fund of knowledge, and impulse control as "appropriate." (*Id.*) Dr. Robotti reported plaintiff's insight as fair and her judgment as both appropriate and impaired. (*Id.*) Dr. Robotti further reported that plaintiff had no signs of issues with her sleep, appetite, or energy. (*Id.*)

Dr. Robotti diagnosed plaintiff with a mood disorder, and assessed her GAF at 50. (*Id*. at 476.) Dr. Robotti recommended that plaintiff continue psychotherapy, stabilize her mood, alleviate depression, and correct her "bio signs." (*Id.*)

On June 25, 2014, Dr. Robotti completed a Medical Report for Determination of Disability/Employability for plaintiff. (*Id*. 506-507.) In the report, Dr. Robotti reported that plaintiff suffers from a mood disorder and that plaintiff's records indicate a history of a learning disability. (*Id*. at 506.) In response to a question asking what prevents the patient from working, Dr. Robotti stated, "pending – learning disability." (*Id.*) In connection with plaintiff's history of disability, Dr. Robotti reported that plaintiff would provide documentation of her learning disability. (*Id*. at 507.)

2. Daniel DeRienzis (LMSW)

On February 28, 2012, plaintiff was evaluated by Daniel DeRienzis, LMSW ("Mr. DeRienzis"). (*Id*. at 428-39.) Mr. DeRienzis, a FEGS social worker, completed

---

[1] Dr. Robotti identified plaintiff's fund of knowledge and concentration/attention span as both "good" and "fair." (AR 446.)

an initial Adult Assessment and Psychological evaluation of plaintiff. (*Id.*)

Mr. DeRienzis reported the following: plaintiff's speech was "underproductive" with a somewhat "constricted affect" (*id.* at 438); plaintiff's "body language and tone of voice suggest[ed] depression" (*id.* at 428); plaintiff had a history of anger problems, and "is easily provoked and has trouble controlling herself and deescalating situations" (*id.* at 431); plaintiff had previously intentionally or accidentally damaged property, including punching walls and breaking phones in fits of rage (*id.* at 432); at age thirteen, plaintiff was forced to regularly have sexual intercourse with a fourteen-year-old classmate for two months (*id.*); plaintiff experienced developmental "problems/delays" during adolescence due to repeated sexual assaults (*id.* at 434); and plaintiff was at high risk for damaging property, acute psychosocial stressors, and complying with her medication (*id.* at 437).

With respect to plaintiff's daily and family life, Mr. DeRienzis reported that, during the day, plaintiff watches television and sleeps (*id.* at 432); plaintiff has limited hobbies, leisure activities, social involvement, and community involvement (*id.* at 433); and plaintiff has a "fair" relationship with her family members, other than with her father, "who, due to problems with drugs, has grown distant from [plaintiff] and caused [plaintiff] to lose respect and/or compassion for him" (*id.* at 435).

The "Clinical Formulation" portion of the evaluation stated that plaintiff presented with symptoms of depression and problems with anger management, and concluded that plaintiff would benefit from individual counseling, anger management, and psychiatric evaluation for possible medication. (*Id.* at 438.)

Plaintiff continued to see Mr. DeRienzis approximately every week thereafter. Plaintiff canceled or did not show up to several appointments. (*See, e.g.*, *id.* at 516.) Plaintiff also requested extra sessions at times. (*Id.*)

On November 12, 2012, Mr. DeRienzis reported that he attempted to provide plaintiff with "insight-oriented therapy" to improve plaintiff's ability to handle her feelings of anger and to respond to such feelings effectively. (*Id.* at 545.) On April 24, 2013, Mr. DeRienzis reported that plaintiff was unable to "break the pattern she has of either isolating or becoming aggressive." (*Id.* at 561.)

### 3. Dr. Syedqambar Naqvi

On August 26, 2013, plaintiff was evaluated by Syedqambar Naqvi, M.D. ("Dr. Naqvi") at FEGS. (*Id.* at 483-91.) Dr. Naqvi reported that plaintiff had been in therapy since she was sixteen years old, but that plaintiff's mother would not permit her to be treated with medications at that time. (*Id.* at 483.) Dr. Naqvi further reported that plaintiff first reported suffering from depression when she was twelve, and that plaintiff was severely depressed after having her first child, but that she responded positively to medication. (*Id.*) Plaintiff's depression worsened when she became pregnant with her second child, and plaintiff reported suffering from anger issues and relationship problems with her mother. (*Id.*)

In connection with the mental status examination of plaintiff, Dr. Naqvi reported plaintiff's awareness/attention as lethargic (*id.* at 486); behavior as restless, fidgety, and clumsy (*id.*); attitude toward Dr. Naqvi as evasive and anxious (*id.*); speech as slow (*id.* at 487); emotional affect as normal (*id.* at 488); mood as depressed and anxious (*id.*); congruence of mood with situation and content as appropriate (*id.*); judgment as

appropriate for age (*id*. at 488); insight into illness as appropriate for age (*id*.); impulse control as appropriate for age (*id*.); and noted that plaintiff suffered from feelings of helplessness, hopelessness, and worthlessness (*id*. at 486). Dr. Naqvi further reported plaintiff's thought processes as appropriate, with no disorders present, although Dr. Navi noted that plaintiff suffered from hallucinations. (*Id*. at 487.)

Dr. Naqvi reported plaintiff's cognitive functioning as "poor" with respect to concentration/attention span. (*Id*. at 488.) Dr. Naqvi otherwise reported plaintiff's cognitive functioning as "fair"; Dr. Naqvi did not report plaintiff's functioning as "good" in any category. (*Id.*)

Dr. Naqvi diagnosed plaintiff with depressive disorder and assessed plaintiff's current GAF as 45. (*Id*. at 490.) Dr. Naqvi recommended that plaintiff should continue therapy, and noted that plaintiff would return for medications in two weeks, when she was done breastfeeding her child. (*Id*. at 491.)

4. Dawn Knapper (LMSW)

On December 11, 2013, Dawn Knapper, LMSW ("Ms. Knapper"), a social worker at FEGS, examined plaintiff. (*Id*. at 478-79.) Ms. Knapper's "Psychosocial Update" reported that there had been no changes in plaintiff's psychiatric condition. (*Id*. at 478.) In the "Clinical Formulation" section of the update, Ms. Knapper reported that plaintiff "requires continued 1:1 psychotherapy to resolve psychosocial stressor and develop coping skills to manage same effectively. [Plaintiff] continues to require monthly medication management visits with the psychiatrist." (*Id*. at 479.) Ms. Knapper diagnosed plaintiff with mood disorder, and noted that she was currently prescribed Seroquel, Lexapro, Wellbutrin, and Klonopin. (*Id.*)

Ms. Knapper conducted Psychiatric Assessments of plaintiff, on March 5, 2014 and July 30, 2014, for the Nassau County Department of Social Services. (*Id*. at 505, 503.) In the March 5, 2014 assessment, Ms. Knapper reported that plaintiff was prescribed Lexapro, Seroquel, Wellbutrin, and Klonopin, but that plaintiff was not "completely compliant" with her medications. (*Id*. at 504.) Ms. Knapper also reported that, on occasion, plaintiff experienced decompensation and behavioral interferences with activities of daily living, but that plaintiff had never been hospitalized. (*Id*. at 505.) With respect to plaintiff's functional limitations, Ms. Knapper reported that plaintiff was moderately limited in maintaining attention and concentration; interacting appropriately with others; maintaining socially appropriate behavior; and performing low stress, simple tasks. (*Id.*) Ms. Knapper reported that plaintiff had no evidence of limitation in understanding and remembering simple instructions; understanding and remembering complex instructions; maintaining personal hygiene; and using public transportation. (*Id.*) Ms. Knapper further reported that plaintiff could participate in an education, training, or a rehabilitation program for three hours per week. (*Id.*) Ms. Knapper did not report that plaintiff was capable of participating in employment or work experience activities. (*Id.*)

On April 24, 2014, Ms. Knapper completed a Mental Impairment Questionnaire regarding plaintiff. (*Id*. at 496-501.) Ms. Knapper reported that plaintiff suffers from sleep disturbances; mood disturbances; social withdrawal or isolation; feelings of guilt/worthlessness; difficulty thinking or concentrating; and hostility and irritability, and that plaintiff reports feeling very tired from her medications. (*Id*. at 496-98.) Under the "Prognosis" portion of the questionnaire, Ms.

Knapper reported that, "with medication management & ongoing therapy, [plaintiff] can recover from mental illness." (*Id*. at 498.)

In the questionnaire, Ms. Knapper also reported on plaintiff's ability and aptitude to perform work-related activities in a regular work setting. (*Id*. at 499.) Ms. Knapper was directed to evaluate plaintiff's ability as either "unlimited or very good"; "good"; "fair"; or "poor or none." (*Id*.) Ms. Knapper reported plaintiff's ability to carry out very short and simple instructions; maintain regular attendance and be punctual; make simple work-related decisions; ask simple questions or request assistance; and be aware of normal hazards and take appropriate precautions as "fair." (*Id*.) The questionnaire defined fair as the "[a]bility to function in this area is seriously limited, but not precluded." (*Id*.) Ms. Knapper reported that plaintiff had poor or no ability to do the following: remember work-like procedures; understand and remember short and simple instructions; maintain attention for two-hour segment; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; complete a normal workday and workweek without interruptions from psychologically-based symptoms; perform at a constant pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in routine work setting; and deal with normal work stress. (*Id*.) The questionnaire defined "poor or none" as "[n]o useful ability to function in this area." (*Id*.) Ms. Knapper did not report plaintiff having "unlimited or very good" or "good" abilities to do any work-related tasks. (*See id*.) To support her findings, Ms. Knapper reported that plaintiff had difficulty

concentrating, poor interpersonal skills, and difficulty appropriately managing her anger. (*Id*. at 499-500.)

Ms. Knapper further reported that plaintiff had poor or no mental ability or aptitude to understand and remember detailed instructions; carry out detailed instructions; set realistic goals or make plans independently of others; or deal with stress of semi-skilled and skilled work, explaining that plaintiff "has marked difficulty concentrating" and "stay[ing] on task." (*Id*. at 500.)

In connection with plaintiff's mental ability and aptitude to perform particular types of jobs, Ms. Knapper reported that plaintiff had poor or no ability and aptitude to interact appropriately with the general public; and fair ability and aptitude to maintain socially appropriate behavior and use public transportation, explaining that plaintiff "has poor coping skill[s] regarding anger management" and "is easily agitated." (*Id*.)

Finally, in connection with plaintiff's functional limitations, Ms. Knapper reported that plaintiff had "marked" difficulties maintaining social functioning and "frequent" deficiencies in concentration, persistence, or pace, limiting her ability to timely complete tasks. (*Id*.) Ms. Knapper explained that plaintiff reported being unable to sit for an extended period of time. (*Id*. at 501.)

In connection with plaintiff's July 30, 2014 visit, Ms. Knapper reported that plaintiff had "moderately limited" abilities to maintain attention and concentration; interact appropriately with others; maintain socially appropriate behavior; and perform low stress, simple tasks. (*Id*. at 503.) The assessment defined "moderately limited" as "unable to function 50% of the time." (*Id*.) Ms. Knapper further reported that plaintiff's "current level of depression will impair her

ability to participate in [education and training] activities." (*Id.*)

5. Dr. Paul Herman

On August 22, 2011, plaintiff was examined by psychologist Paul Herman, Ph.D. ("Dr. Herman"). (*Id*. at 389-92.) Dr. Herman conducted a one-time consultative examination of plaintiff for the SSA. (*See id*.) Dr. Herman reported that plaintiff had adequate speech and language skills (*id*. 389); recalled and understood instructions (*id.*); and had good attention and concentration (*id*. at 390).

As part of the examination, Dr. Herman administered the Wide Range Achievement Test, Fourth Addition ("WRAT-IV"). (*Id.*) In the area of "Reading/Decoding," plaintiff scored a 66, which was a grade equivalent of 3.2. (*Id.*) Dr. Herman concluded that this was "consistent, or somewhat above that which would be expected given [plaintiff's] overall level of cognition," and that it did not "indicate the presence of a reading disorder." (*Id.*) In light of the fact that plaintiff had recently undergone a comprehensive cognitive evaluation in connection with her special education classes, Dr. Herman reported that he used an alternate standardized measure of cognitive ability to avoid artificially inflated scores. (*Id.*) Plaintiff scored 75 on the Nonverbal Intelligence-3 (TONI-3) test, which placed her in the borderline range of cognitive ability. (*Id.*) Dr. Herman concluded that, overall, plaintiff's "level of cognition is adequate for many vocational endeavors and does not preclude vocational functioning." (*Id.*)

Dr. Herman further reported that plaintiff appeared capable of the following: understanding simple directions; performing simple tasks; maintaining attention and concentration sufficient for low-level employment; maintaining a regular schedule;

learning new tasks; making simple work-related decisions; adequately relating to others; and appropriately handling stress. (*Id*. at 390-91.) Although Dr. Herman reported that plaintiff might have difficulty performing complex tasks and that the results of his examination were consistent with "borderline intellectual functioning," he concluded that it did not appear "significant enough to interfere with [plaintiff's] ability to function on a daily basis to the extent that vocational functioning would be precluded." (*Id*. at 391.)

Dr. Herman diagnosed plaintiff with "[b]orderline intellectual functioning" and recommended vocational training. (*Id.*) Dr. Herman reported plaintiff's prognosis as "[f]air to good given the absence of more prominent symptomatology, but some difficulty in her circumstances." (*Id.*) Dr. Herman, however, also reported that plaintiff would need assistance managing funds given her lack of experience in this area. (*Id.*)

6. G. Wing

On August 30, 2011, G. Wing ("Ms. Wing"), a state agency psychiatric consultant, submitted a "Psychiatric Review Technique" (*id*. at 393-406) and "Mental Residual Functioning Capacity Assessment" (*id*. at 407-10) regarding plaintiff. Ms. Wing did not examine plaintiff prior to submitting these reports.

In the Psychiatric Review Technique, Ms. Wing reviewed plaintiff under listing Section 12.05 (intellectual disability). (*Id*. at 393, 397.) Ms. Wing concluded that plaintiff had a learning disability, but that it did not satisfy the criteria for listing Section 12.05. (*Id*. at 397.) When evaluating plaintiff's functional limitations—the "B" criteria of the listings—Ms. Wing concluded that plaintiff had "moderate" restrictions with respect to daily living activities; difficulties in maintaining social functioning; and difficulties in

maintaining concentration, persistence, or pace. (*Id*. at 403.) Ms. Wing reported that plaintiff had never experienced repeated episodes of deterioration with extended duration. (*Id*.)

In the Mental Residual Functional Capacity Assessment, Ms. Wing found that plaintiff was moderately limited in her ability to understand and carry out simple instructions; concentrate for up to two hours at a time; relate to supervisors and co-workers; and adapt to changes in the work environment. (*Id*. at 409.) Ms. Wing then concluded that plaintiff could perform simple tasks. (*Id.*)

### 7. Y. Burstein

On July 16, 2012, medical consultant Mr. Burstein submitted a "Psychiatric Review Technique" (*id*. at 450-63) and "Mental Residual Functional Capacity Assessment" (*id*. at 385-88) regarding plaintiff. In the Psychiatric Review Technique, Mr. Burstein reviewed plaintiff under listing Section 12.02 (organic mental disorders) and concluded that plaintiff had a learning disability that did not satisfy the criteria for that listing. (*Id*. at 450-51.) When evaluating plaintiff's functional limitations—the "B" criteria of the listings—Mr. Burstein concluded that plaintiff had moderate difficulties in maintaining concentration, persistence, or pace; mild restrictions of activities of daily living; mild difficulties in maintaining social functioning; and no repeated episodes of deterioration with extended duration. (*Id*. at 460.)

In the Mental Residual Functional Capacity Assessment, Mr. Burstein reported that plaintiff showed no evidence of a thought disorder and had adequate judgment and insight; attention, concentration, and memory for simple tasks; and interpersonal skills. (*Id*. at 387.) Mr. Burstein, however, also reported plaintiff's IQ as "borderline," and that the

evidence presented was "partially consistent with [plaintiff's] allegation of psychological symptoms." (*Id*.) Mr. Burstein found that, "[a]lthough [plaintiff] does show evidence of symptoms, these complaints are not considered to be significantly limiting," and that plaintiff was able to follow simple directions; sustain concentration for simple tasks; and adapt to simple changes and relate adequately to others. (*Id.*) Mr. Burstein concluded that there were "no listing met or equaled on [plaintiff]." (*Id.*)

## C. Relevant Testimonial Evidence

Plaintiff had an administrative hearing on April 25, 2014 in Jericho, New York, before ALJ April Wexler. (*Id*. at 52-66.) Plaintiff appeared with her then-counsel, Milton Braxter. Plaintiff had a supplemental administrative hearing on August 8, 2014, where she also appeared before ALJ Wexler with Mr. Braxter as counsel. (*Id*. at 69-82.)

### 1. Plaintiff's Testimony at the Hearing and Supplemental Hearing

The following is a summary of plaintiff's testimony at the hearings.

Plaintiff lives in Elmont, New York with her mother, sister, and her two children (eight months and four years old at the time of the hearing), and her sister's two children. (*Id*. at 54.) She has a driver's license and drives. (*Id.*) Plaintiff attended special education classes until tenth or eleventh grade. (*Id.*)

Plaintiff suffers from a mood disorder and a learning disability. (*Id*. at 55.) She attends therapy with Dr. Knapper once a week, and takes the following medications prescribed by Dr. Robotti: Seroquel, Lexapro, Klonopin, and Wellbutrin. (*Id*. at 55-56.) Seroquel treats bipolar disorder and depression; Lexapro treats depression; Klonopin treats panic attacks; and Wellbutrin treats depression. (Pl. Mem., 19-20, nn. 7-10, ECF No. 10.) Plaintiff takes her medication

daily, which helps her. (AR 63.) When asked by the ALJ whether plaintiff received any other treatment for her learning disability, plaintiff responded, "No." (*Id*. at 56.)

Plaintiff is able to bathe, dress, feed herself and her children, and do laundry and other chores, including the dishes. (*Id*. at 56-57, 61.) Plaintiff is the primary caregiver for her children, but their father takes them for eight hours, two to three days per week. (*Id*. at 58-59, 61.) She is able to drive and run errands, such as going to Office Max and shopping for clothes, but she does not go to the grocery store by herself. (*Id*. at 60-61.)

Plaintiff applied for jobs, but she did not hear back from the employers. (*Id*. at 62.) When asked by the ALJ what would prevent her from working as a cashier, plaintiff responded that she has a mood disorder, and that she cannot be around people for too long. (*Id.*) Plaintiff sometimes socializes with her sister, but she does not have any friends. (*Id*. at 61.)

Plaintiff sometimes yells at her children, and approximately once a week, her mother has to intervene because plaintiff cannot control her mood. (*Id*. at 62-63.) Plaintiff, however, is not concerned about being alone with her children, testifying that she would never hurt them. (*Id*. at 63.) When asked by the ALJ why plaintiff could not control her behavior in a work setting, plaintiff responded, "[b]ecause it's a different story with other people." (*Id*. at 64.)

Plaintiff spends her time at home watching her kids and sitting outside. (*Id.*) Plaintiff does not have hobbies, but she sometimes watches television and goes on Facebook to talk to her sisters and cousins. (*Id.*) Approximately three days a week, plaintiff stays in her bedroom to avoid altercations. (*Id*. at 65.) Plaintiff's mother or grandmother watch her children on these days. (*Id.*)

At the supplemental hearing, plaintiff testified that her depression and learning disability affect her ability to function in the workplace because she is unable to perform simple tasks and she gets frustrated easily. (*Id*. at 81-82.)

### 3. Plaintiff's Mother

Plaintiff's mother, Amy Gardner, submitted a "Function Report" (*id*. at 299-307), as well as a letter to ALJ Wexler on August 8, 2014 (*id*. at 354-55). Plaintiff's mother reported that plaintiff is sometimes up all night, and other times sleeps all day. (*Id*. 300.) In addition, plaintiff's mother reported that plaintiff rarely prepares meals because she has no patience. (*Id*. at 301.) Instead, plaintiff's mother prepares plaintiff's meals (*id*. at 302); plaintiff's mother also assists plaintiff with childcare (*id*. at 300).

### 4. Preventative Worker

On July 10, 2012, a preventive worker from Mercy First submitted a "Report of Contact" with plaintiff. (*Id*. at 312-313.) The report noted that plaintiff "frequently leaves her daughter with [her mother] and goes out a lot," and that plaintiff "seems to leave a lot of her daughter's care to [her mother]." (*Id*. at 312.) The report also states that plaintiff "tends to be argumentative." (*Id.*)

### 5. Housing Worker

Janis Davison, a housing worker, also submitted a "Report of Contact" with plaintiff dated July 9, 2012. (*Id*. at 310-11.) The housing worker reported that plaintiff was "not your average adult 18 year old. She definitely has limitations." (*Id*. at 310.) The housing worker also reported that plaintiff was unable to care for her daughter without the help of her mother, and that she "doesn't always know right from wrong." (*Id.*)

6. Vocational Evidence

The ALJ asked David Vandergoot, Ph. D. ("Dr. Vandergoot") to respond to written interrogatories as an impartial vocational expert ("VE"). (*Id*. at 344-347.) In the interrogatories, Dr. Vandergoot was presented with two hypothetical situations. (*Id*. at 345.) In both hypothetical situations, Dr. Vandergoot was asked to assume that the individual was born on May 24, 1993; had limited education; was able to communicate in English; and had no work experience. (*Id*. at 344-45.) In the first hypothetical, Dr. Vandergoot was asked to assume that the individual was:

> Limited to simple routine repetitive tasks, low stress jobs which means no work at fixed production rate pace, with work that is checked at the end of the workday or workweek rather than hourly or throughout the day. Limited to occasional contact with supervisors and co-workers and no contact with members of the general public.

(*Id*. at 345.) Dr. Vandergoot reported that the individual in the first hypothetical could perform the following unskilled jobs in the national economy: photocopy machine operator (60,000 jobs in the national economy); garment sorter (40,000 jobs in the national economy), and routing clerk (100,000 jobs in the national economy). (*Id*. at 346.)

In the second hypothetical, Dr. Vandergoot was asked to consider the same facts as in the first hypothetical, with the additional fact that the individual "[h]as the need to be off task 20% of the workday." (*Id*. at 345.) Dr. Vandergoot reported that there were no unskilled jobs in the national economy that the individual in the second hypothetical could perform. (*Id*. at 346.)

On August 8, 2014, Dr. Vandergoot testified at the supplemental hearing. At the hearing, counsel for plaintiff asked Dr. Vandergoot to define "low stress jobs" as it was used in the hypotheticals posed by the ALJ. (*Id*. at 72.) Dr. Vandergoot responded that a low stress job "is typically one that is described as unskilled in the DOT, and that does not have set production quotas over a set period of time, typically is maybe one, [two,] three or four-step tasks, in terms of completing the job." (*Id*.) When asked who decides whether a job is "low stress," Dr. Vandergoot responded: "No one decides it. It's just my understanding of the factors that are involved in completing the job that I feel makes the job low stress. There is no rule or specific definition of low stress." (*Id*. at 72-73.)

Dr. Vandergoot further testified that an individual that suffers from mood swings and is unable to handle low stress could not perform the jobs listed in response to the first hypothetical. (*Id*. at 73.) In addition, Dr. Vandergoot testified that "[t]here are no employers who would have no production expectations." (*Id*. at 74.) In response to questions from plaintiff's counsel, Dr. Vandergoot further acknowledged issues that might come up in employment as a photocopy machine operator, garment sorter, or routing clerk. (*Id*. at 74-77.) Finally, Dr. Vandergoot testified that he used the DOT definitions to define the three jobs listed in response to the first hypothetical, and that those definitions were last updated in 1991. (*Id*. at 80.)

II. Procedural Background

A. Administrative History

Following plaintiff's eighteenth birthday, plaintiff received an "Age 18 Redetermination Notice" dated September 2, 2011 ("the Redetermination Notice"). (*Id*. at 90-93.) The Redetermination Notice stated

that plaintiff no longer qualified for Supplemental Security Income ("SSI") because she was not found to be disabled under the definition of disability for adults. (*Id.* at 90.) More specifically, the Redetermination Notice provided that the SSA had determined that plaintiff's condition was "not severe enough" to keep plaintiff from working. (*Id.* at 93.) The Redetermination Notice further provided that, despite plaintiff's reported mental problems, the reports "did not show any conditions of a nature that would prevent [plaintiff] from working," and that based on plaintiff's age, education, and experience, plaintiff could perform a job with simple tasks. (*Id.*)

On December 19, 2012, plaintiff submitted a request for reconsideration with the SSA. (*Id.* at 98-99.) Plaintiff had a hearing with a Disability Hearing Officer ("DHO") on February 22, 2013, where plaintiff appeared without counsel. (*Id.* at 102-15.) The DHO concluded that plaintiff was not disabled on December 22, 2013. (*Id.* at 108.)

On March 18, 2013, plaintiff submitted a request for a hearing before an ALJ. (*Id.* at 119.) Plaintiff appeared *pro se* at a hearing with an ALJ on December 12, 2013, but the hearing was continued so that plaintiff could retain counsel. (*Id.* at 44-49.)

On April 25, 2014, plaintiff appeared with counsel and testified at a hearing before ALJ Wexler. (*Id.* at 50-66.) On May 20, 2014, counsel for plaintiff requested a supplemental hearing in order to cross-examine Dr. Vandergoot, who had submitted written interrogatories. (*Id.* at 352-53.) On August 8, 2014, ALJ Wexler held a supplemental hearing. Plaintiff appeared at the hearing with her counsel, and Dr. Vandergoot testified. (*Id.* at 67-82.)

On September 2, 2014, ALJ Wexler issued an opinion concluding that plaintiff's disability ended on September 2, 2011, and that plaintiff had not thereafter become disabled. (*Id.* at 24-43.) On November 6, 2014, plaintiff submitted a request for review of the ALJ's September 2, 2014 decision to the Appeals Council. (*Id.* at 18.) The Appeals Council denied plaintiff's request on March 22, 2016, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 1-6.)

B. The Instant Case

Plaintiff commenced the instant action on May 19, 2016. (ECF No. 1.) On April 26, 2017, plaintiff moved for judgment on the pleadings. (ECF No. 9.) The Commissioner submitted a cross-motion for judgment on the pleadings on September 14, 2017. (Def. Mem., ECF No. 13-1.) On October 26, 2017, plaintiff responded to the Commissioner's cross-motion for judgment on the pleadings (ECF No. 15), and, on December 14, 2017, the Commissioner filed a reply in further support of her cross-motion for judgment on the pleadings. (ECF No. 17.) The Court has fully considered the parties' submissions.

III. STANDARD OF REVIEW

A district court may set aside a determination by the Commissioner "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek v. Colvin*, 802 F.3d 370, 374-75 (2d Cir. 2015) (citing *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008); 42 U.S.C. § 405(g)). The Supreme Court has defined "substantial evidence" in Social Security cases to mean "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013). Furthermore, "it is up to the

agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, "even if [the court] might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (citation omitted); *see also Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner.").

## IV. DISCUSSION

### A. The Disability Determination

A claimant is entitled to disability benefits if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the Social Security Act unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 1382c(a)(3)(B).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims.[2] *See* 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has summarized this procedure as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual function capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Perez*, 77 F.3d at 46). The claimant bears the burden of proof with respect to the first four steps; the Commissioner bears the burden of proving the last step. *Id.*

The Commissioner must consider the following in determining a claimant's entitlement to benefits: "(1) the objective medical facts; (2) diagnosis or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by

---

[2] The ALJ performs this five-step procedure in the first instance; the Appeals Council then reviews the ALJ's decision and determines if it stands as the Commissioner's final decision. *See, e.g.*, *Greek*, 802 F.3d at 374.

the claimant or others; (4) the claimant's educational background, age, and work experience." *Id.* (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

B. The ALJ's Ruling

The ALJ concluded that plaintiff's disability ended on September 2, 2011, and that plaintiff had not become disabled again following that date. (AR 24-37.)

The ALJ did not conduct the first step of the five-step procedure described above, because the plaintiff's current employment is not considered when redetermining disability at the age of eighteen. (*Id.* at 25 (citing 20 C.F.R. § 416.987(b)).)

At step two, the ALJ determined that plaintiff had the following severe impairments: borderline intellectual functioning and mood disorder. (*Id.* at 26.) The ALJ noted that these impairments "impose more than minimal functional limitations." (*Id.*)

At step three, the ALJ concluded that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. §§ 416.920(d), 416.925, or 416.926. (*Id.*) The ALJ specifically considered listings 12.04 (depressive, bipolar and related disorders) and 12.05 (intellectual disorder).

As to listing 12.05, the ALJ determined that plaintiff failed to meet the "diagnostic description in the introductory paragraph," which required "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the

evidence demonstrates or supports onset of the impairment before age 22." (*Id.* at 27.) The ALJ noted that adaptive functioning is defined as "the individual's progress in acquiring mental, academic, social and personal skills as compared with other unimpaired individuals of his/her same age." (*Id.* (citing POMS DI 24515.056d.2).)

Specifically, the ALJ found that, despite plaintiff's low IQ scores, plaintiff's school records reflected that she had "made good progress in acquiring academic and social skills." (*Id.* at 27.) The ALJ found that plaintiff was on track to graduate with an IEP diploma and pursue competitive work, but she was dismissed from school due to nonattendance. (*Id.*) The IEP indicated that plaintiff showed a "basic understanding" of addition and subtraction and could identify bills and coins. (*Id.*) The ALJ also found that plaintiff's daily activities demonstrated "strong mental, social, and personal skills." (*Id.*)

The ALJ concluded that plaintiff had "not shown that she has the deficits in adaptive functioning required to satisfy the diagnostic description of listing 12.05," and, therefore, that the "severity of her borderline intellectual functioning [did] not meet the criteria of listing 12.05." (*Id.* at 28.)[3]

Moving on to step four, the ALJ determined that plaintiff had the residual functional capacity to perform work at all exertional levels with non-exertional limitations, including: simple routine repetitive tasks, low stress jobs, occasional contact with co-workers and supervisors and no contact with members of the general public. (*Id.* at 29.)

---

[3] The ALJ also found that plaintiff did not meet the criteria for listing 12.04. Plaintiff, however, does not challenge the ALJ's findings with respect to listing 12.04. Accordingly, the Court need not, and does not, discuss listing 12.04.

Based on the testimony of the vocational expert, and considering plaintiff's age, education, work experience, and residual functional capacity, the ALJ concluded that plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy (*Id.* at 35-36.) The ALJ found that plaintiff was, therefore, not disabled from the onset of her disability on July 4, 2012, through the date of the ALJ's decision. (*Id.* at 36.)

## C. Application

Plaintiff challenges the ALJ's decision, finding that plaintiff has not been disabled since September 2, 2011. Specifically, plaintiff asserts that the ALJ: (1) failed to apply the correct legal standard;[4] and (2) failed to develop the record.[5]

As set forth below, the Court finds that remand is required for two reasons. First, the ALJ failed to properly evaluate the medical evidence. In particular, the ALJ failed to provide good reasons for not crediting plaintiff's treating physicians' opinions and for assigning the weight she did to a single consultative examiner opinion. Second, the ALJ failed to adequately develop the record.[6]

### 1. Failure to Properly Evaluate the Medical Evidence

The Commissioner must give special evidentiary weight to the opinion of the treating physician. *See Clark*, 143 F.3d at 118. The "treating physician rule," as it is known, "mandates that the medical opinion of a claimant's treating physician [be] given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *see also, e.g.*, *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999); *Clark*, 143 F.3d at 118. The rule, as set forth in the regulations, provides:

> Generally, we give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairments(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Although treating physicians may share their opinions concerning a patient's inability to

---

[4] Plaintiff alleges that the ALJ: (1) failed to adhere to the treating physician's rule; (2) erred by relying on vocational testimony resulting from a deficient hypothetical question; and (3) improperly evaluated plaintiff's learning disability under Listing 12.05 at step three of the sequential evaluation.

[5] Plaintiff alleges that the ALJ: (1) failed to obtain necessary evidence; and (2) failed to elicit testimony from plaintiff regarding her learning disability.

[6] As it is remanding on other grounds, the Court does not rule on plaintiff's argument regarding the deficient hypothetical question. (Pl. Mem. at 5.) However, on remand (if the ALJ continues to rely upon the VE's response after conducting further proceedings consistent with this Memorandum and Order), the ALJ should explain whether she considered the VE's written response to the second hypothetical and the VE's verbal response to the representative's hypothetical, which included plaintiff's mental health limitations, wherein VE stated plaintiff would not be able to do such jobs. (*Id.* at 27.)

work and the severity of the disability, the ultimate decision of whether an individual is disabled is "reserved to the Commissioner." *Id.* § 404.1527(d)(1); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("[T]he Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability.").

If the opinion of the treating physician as to the nature and severity of the impairment is not given controlling weight, the ALJ must apply various factors to decide how much weight to give the opinion. *See Shaw*, 221 F.3d at 134; *Clark*, 143 F.3d at 118. These factors include: (i) the frequency of examination and the length, nature, and extent of the treatment relationship, (ii) the evidence in support of the opinion, (iii) the opinion's consistency with the record as a whole, (iv) whether the opinion is from a specialist, and (v) other relevant factors. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see Clark*, 143 F.3d at 118. When the ALJ chooses not to give the treating physician's opinion controlling weight, he must "give good reasons in his notice of determination or decision for the weight [he] gives [the claimant's] treating source's opinion." *Clark*, 143 F.3d at 118 (quoting C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)); *see also Perez v. Astrue*, No. 07-cv-958 (DLI), 2009 WL 2496585, at *8 (E.D.N.Y. Aug. 14, 2009) ("Even if [the treating physician's] opinions do not merit controlling weight, the ALJ must explain what weight she gave those opinions and must articulate good reasons for not crediting the opinions of a claimant's treating physician."). A failure by the ALJ to provide "good reasons" for not crediting the opinion of a treating physician is a ground for remand. *See Snell*, 177 F.3d at 133; *Halloran*

*v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.").

As an initial matter, it is undisputed that Ms. Knapper and Dr. Robotti were plaintiff's treating physicians. (*See* AR 27 (referring to Dr. Robotti as the "[t]reating psychiatrist" and Ms. Knapper as plaintiff's "therapist")). Plaintiff argues that the ALJ "committed legal error" by failing to accord "controlling weight" to these two opinions. (Pl. Mem. at 23.) The Commissioner argues that the ALJ gave the opinions "appropriate weight." (Def. Mem. at 24.) The Court finds that remand is required because the ALJ failed to give "good reasons" for according less than controlling weight to the opinions of plaintiff's treating physicians, while giving "great weight" to a consultative examiner's opinion.

First, the Court finds that the ALJ failed to provide sufficient reasons for giving "no weight" to Dr. Robotti's opinion. Dr. Robotti was plaintiff's treating psychiatrist throughout the relevant period, seeing plaintiff monthly. Although Dr. Robotti's report indicated that plaintiff had a learning disability that prevents her from working, the ALJ gave the report no weight because it is "phrased as the claimant's report" and because Dr. Robotti was awaiting reports to confirm the existence of an impairment.[7] (AR 34-35.) The ALJ gave no additional explanation for deviation from the treating physician rule. The Commissioner acknowledges that the ALJ rejected the treating physician opinions to the degree

---

[7] The Court notes that Dr. Robotti's March 26, 2012 evaluation stated that plaintiff had been "dxed [diagnosed] as learning disabled and emotionally

disturbed since childhood." (AR 443.) The Commissioner's papers do not appear to address this language.

"that it was based upon disability due to a learning disorder" because the medical source opinions were "predominately based on the claimant's subjective reporting." (Def. Mem. at 24.) However, it is inappropriate for the ALJ to "substitute his own expertise or view of the medical proof for the treating physician's opinion." *Shaw*, 221 F.3d at 134 (citing *Balsamo v. Chater,* 142 F.3d 75, 81 (2d Cir. 1998)). In short, the ALJ's purported justifications for giving "no weight" to Dr. Robotti's opinions were not sufficiently substantive. *See Perez*, 2009 WL 2496585, at *8 ("Even if [the treating physician's] opinions do not merit controlling weight, the ALJ must explain what weight she gave those opinions and must articulate good reasons for not crediting the opinions of a claimant's treating physician.").

Second, the ALJ failed to provide sufficient reasons for giving "some" weight to a particular portion of Ms. Knapper's report that was "consistent with Dr. Herman's report and findings," but no weight to the rest of the report. (AR 34.) Ms. Knapper, as plaintiff's therapist, treated plaintiff weekly during the relevant time period. The ALJ cannot select evidence that supports a particular conclusion without providing adequate explanation for each decision. *See Pogozelski v. Barnhart*, No. 03 CV 2914 (JG), 2004 WL 1146059, at *17 (E.D.N.Y. May 19, 2004); *see also Rivera v. Bowen*, 665 F. Supp. 201, 205 (S.D.N.Y. 1987) ("[A]lthough the ALJ is not required explicitly to reconcile every conflicting shred of medical testimony, he cannot pick and choose evidence that supports a particular

conclusion."). Under the circumstances in this case, the ALJ did not provide a sufficient basis for carving out certain findings of plaintiff's treating physician that support the conclusion of the consultative examiner, while summarily discarding all other findings as "uncorroborated." [8] (AR 34.)

Although the Commissioner argues that it discounted Ms. Knapper's findings due to her other reports indicating a lesser level of limitation (Def. Mem. at 25), those same reports also show Ms. Knapper indicating that plaintiff's "current level of depression may impair her ability to participate in activities indicated" (AR 503, 505). Ms. Knapper opined that the plaintiff has "poor to no ability to perform most of the basic mental tasks of work." (*Id.* at 496-503.) The Court finds it notable that Ms. Knapper found that plaintiff had poor or no ability to remember work-like procedures or understand and remember short and simple instructions (*id.* at 499), fundamental skills necessary for almost any area of employment. [9] Accordingly, the Court finds that the ALJ did not give sufficient reasons for completely discounting much of Ms. Knapper's opinion.

Finally, the Court finds that the ALJ improperly afforded "great weight" to Dr. Herman's opinion as consultative examiner. The Second Circuit has indicated that, by extension of the treating physician rule, ALJs should not rely heavily on findings by consultative examiners or non-examining doctors. *Selian*, 708 F.3d at 419 ("ALJs should not rely heavily on the findings of consultative physicians after a single

---

[8] The Court notes that the ALJ found that the lack of Ms. Knapper's office visit notes prevented her from finding corroboration by objective evidence. However, as discussed *infra*, the ALJ should have further developed the record by obtaining and reviewing such notes.

[9] Ms. Knapper further reported that plaintiff had poor or no mental ability or aptitude to understand and

remember detailed instructions; carry out detailed instructions; set realistic goals or make plans independently of others; or deal with stress of semi-skilled and skilled work, explaining that plaintiff "has marked difficulty concentrating" and "stay[ing] on task." (AR 500.)

examination."). In *Selian*, the ALJ rejected the treating physician's diagnosis based in part on the opinion of another physician who "performed only one consultative examination." 708 F.3d at 419. The Second Circuit held that, in doing so, the ALJ "fail[ed] to provide 'good reasons' for not crediting [the treating physician's] diagnosis," and that failure "by itself warrant[ed] remand." *Id.* In *Cruz v. Sullivan*, the Second Circuit explained that "a consulting physician's opinions or report should be given limited weight . . . because 'consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day.'" 912 F.2d 8, 13 (2d Cir. 1990) (quoting *Torres v. Bowen*, 700 F. Supp. 1306, 1312 (S.D.N.Y. 1988).

Here, Dr. Herman based his opinion on a single examination of plaintiff. (AR 389-92.) After diagnosing plaintiff with "borderline intellectual functioning," he concluded that it did not appear "significant enough to interfere with [plaintiff's] ability to function on a daily basis to the extent that vocational functioning would be precluded." (*Id.* 391.) This opinion is at odds with those of the treating physicians, who found plaintiff to be much more limited. Given that Dr. Herman examined plaintiff once, and the stark contrast between his opinion and those of the treating physicians, the Court finds the ALJ incorrectly assigned controlling weight to this opinion. *See Selian*, 708 F. 3d at 419 (finding that the ALJ gave an inappropriate amount of weight to the findings of a consultative physician after a single

examination.); *see also Gonzalez,* 113 F. Supp. 2d at 589 (consulting doctor's single examination of claimant only deserved limited weight).[10]

In sum, the ALJ committed legal error by failing to provide "good reasons" for declining to afford controlling weight to the treating physicians' opinions. *Snell*, 177 F.3d at 133. That failure "by itself warrants remand." *Selian*, 708 F.3d at 419; *see also McAllister v. Colvin*, 205 F. Supp. 3d 314, 332-33 (E.D.N.Y. 2016) (*citing Balodis v. Leavitt*, 704 F. Supp. 2d 255, 265–68 (E.D.N.Y. 2010) (finding remand was warranted when the ALJ did not "explicitly" apply and weigh the various factors that must be considered in determining how much weight to give an opinion of a treating physician). Accordingly, the Court concludes that remand is necessary so that the ALJ can properly consider such opinions or provide sufficient reasons for declining to apply controlling weight.

### 2. Failure to Develop the Record

Plaintiff also asserts that her record was incomplete for two reasons: (1) her psychotherapy notes and IEP were missing from the administrative record (Pl. Mem. at 31); and (2) the ALJ did not question her further when plaintiff indicated that she had a learning disability (*id*. at 33). The Court finds that remand is also required here where, as here, the ALJ's disability determination was based on an under-developed record. As such, the Court does not evaluate ALJ's underlying analysis in its 12.05 determination at this juncture.[11]

---

[10] The Court also notes that any potential harm from the weight given to the CE examination was not isolated to the one report. For example, Medical Examiner Burstein incorporated the CE report into his own limitation analysis. (AR 387.)

[11] With respect to the 12.05 determination, the ALJ acknowledged that plaintiff functions "below age/grade expectations" (AR 257-58), and that she was in special education classes and lacks a social network (*id*. at 299-307; 389-92), but found that her deficits did not satisfy the applicable criteria under 12.05. Obviously, on remand, the ALJ will have re-

The Second Circuit has made clear that an "ALJ, unlike a judge in a trial, must [her]self affirmatively develop the record" in light of "the essentially non-adversarial nature of a benefits proceeding." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (quoting *Echevarria v. Secretary of HHS*, 685 F.2d 751, 755 (2d Cir. 1982)). The Commissioner is required to develop a complete medical record before making a disability determination, 20 C.F.R. § 404.1512(d)-(f) (1995), and that requirement exists even when, as here, the claimant is represented by counsel, *id.* (citing *Perez*, 77 F.3d at 47).

First, as plaintiff points out (Pl. Mem. at 31-32), the ALJ, in support of her decision, made numerous references to materials that were not in the record. (*See e.g.*, plaintiff's IEP at AR 27, 30-31.) Although the Commissioner points to the fact that these materials were submitted to the Appeals Council (Def. Mem. at 23), the Second Circuit has held that, after the Appeals Council denies review, the court's review "focuses on the ALJ's decision." *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015); *see also Perez*, 77 F.3d at 44 (holding that, after the Appeals Council denies review, the ALJ's decision is the final decision subject to judicial review).

The Commissioner claims that, even if it had a duty to obtain the documents, there is no "basis to remand the case" because the materials would have been cumulative of the existing record. (Def. Mem. at 28.) Although the Commissioner argues that there was only

one conclusion that could be reached here and therefore remand is unnecessary (*id.* (citing *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010))), the Court does not agree. The Commissioner argues that the education documents are "in part" and "to some extent" duplicative or cumulative. (*Id.* at 28.) However, the Court cannot conclude that the excluded evidence is "largely identical" to reports the ALJ did consider. *Zabala*, 595 F.3d at 409; *see also Greek*, 802 F. 3d at 376 (stating that *Zabala* dealt with the circumstance in which an ALJ failed to consider a second, virtually identical opinion by the same treating physician.

The lack of psychotherapy notes also implicates the ALJ's decision to give Ms. Knapper's findings little weight. [12] Therefore, the ALJ should have sought and reviewed these notes which may have impacted her determination regarding the weight to be given to Ms. Knapper's findings. *See Shaw*, 221 F.3d at 134 (holding that the ALJ violated its duty to develop the factual record after claiming that plaintiff presented no evidence of disability, while simultaneously discounting the medical opinion of his treating physician); *see also Schaal*, 134 F.3d at 505 ("[E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from [the treating physician] *sua sponte*."). Moreover, the ALJ did not claim that these notes were unnecessary when denying plaintiff's disability claim and, given these circumstances, this Court will not accept "these *post hoc* rationalizations for agency

---

consider these issues in the context of the fully developed record. *See Bros. v. Colvin*, 233 F. Supp. 3d 320, 328 (N.D.N.Y. 2017) (finding it critical that the ALJ did not address the fact that plaintiff had a learning disability and attended special education classes); *see also Geil v. Colvin*, No. 14-CV-6463, 2015 WL 9217026, *9 (W.D.N.Y. Dec. 16, 2015) ("The record is replete with evidence of plaintiff's need for special education classes and such evidence

is particularly relevant to adaptive functioning deficit . . . . Most importantly, perhaps, is the substantial evidence . . . showing that, despite the Commissioner's characterization, plaintiff does not and cannot live independently").

[12] The ALJ noted: "Ms. Knapper's 'findings' are not corroborated by objective evidence in the case record. Ms. Knapper has not provided any of her office visit notes." (AR 34.)

action." *Burlington Truck Lines v. U.S.*, 371 U.S. 156, 168 (1962); *see also McAllister*, 205 F. Supp. 3d at 333; *Losquadro v. Astrue*, No. 11–CV–1798 (JFB), 2012 WL 4342069, at *15 (E.D.N.Y. Sept. 21, 2012).

Second, plaintiff alleges that the ALJ failed to develop important testimonial evidence at the hearing. (Pl. Mem. at 33.) Specifically, the ALJ asked no further questions after being told, by the plaintiff, that plaintiff had a learning disability. (AR 65.) Plaintiff argues that the "ALJ had a duty to probe further details" from plaintiff and therefore the ALJ did not "fully develop the record." (Pl. Mem. at 34.) The Commissioner argues that the ALJ met her duty by asking questions regarding plaintiff's daily function in order to glean how such activities would be impacted by a learning disability. (Def. Mem. at 29.)

The Court recognizes that the ALJ did ask relevant questions during the hearing. However, after telling the ALJ about the learning disability, plaintiff appeared to try to elaborate, stating that she has difficulty with addition, subtraction, and reading. (AR 65.) The ALJ asked no follow-up questions. Given the record, the Court cannot find that the ALJ met her duty "to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Rivera v. Astrue*, No. 06-CV-3326 DLI CLP, 2009 WL 705756, at *7 (E.D.N.Y. Mar. 16, 2009) (quoting *Hankerson v. Harris*, 636 F.2d 893, 895 (2d Cir. 1980)). This duty lies regardless of whether plaintiff is represented by counsel. *See Pratts*, 94 F.3d at 37 ("[T]he rule in our circuit [is] that 'the ALJ, unlike a judge in a trial, must [her]self affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding . . . .' [E]ven when, as here, claimant is represented by counsel.") (quoting *Echevarria*, 685 F.2d at 755).

As "'the ALJ failed to develop the record sufficiently to make' appropriate disability determinations, a remand for 'further findings [that] would so plainly help to assure the proper disposition of [the] claim . . . is particularly appropriate.'" *Butts v. Barnhart*, 388 F.3d 377, 386 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005) (quoting *Rosa*, 168 F.3d at 83 (finding remand appropriate when the ALJ failed to obtain adequate information from plaintiff's treating physician, other doctors and facilities, and consequently reached unsupported conclusions)); *see also Johnson v. Barnhart*, No. 02-CV-1704(NGG), 2004 WL 725309, at *4 (E.D.N.Y. Mar. 8, 2004) ("When the ALJ fails to adequately develop the record, the appropriate remedy is a remand.") (citing *Peed v. Sullivan,* 778 F. Supp. 1241, 1247 (E.D.N.Y.1991)).

Accordingly, on remand, the ALJ shall consider the psychotherapy notes and the IEP, and elicit further testimony from plaintiff regarding her learning disability in order to fully develop the record.

V. CONCLUSION

For the reasons set forth above, plaintiff's motion for judgment on the pleadings is denied. The Commissioner's motion for judgment on the pleadings is also denied. The case is remanded to the ALJ for further proceedings consistent with this Memorandum and Order.

SO ORDERED.

JOSEPH F. BIANCO
United States Circuit Judge
(sitting by designation)

Dated: August 8, 2019
Central Islip, New York

***

Plaintiff is represented by Rezwanul Islam of the Nassau/Suffolk Law Services Committee Inc., 1 Helen Keller Way, 5th Floor, Hempstead, New York 11550. The Commissioner is represented by Assistant United States Attorney Megan Jeanette Freismuth of the U.S. Attorney's Office, 610 Federal Plaza, Central Islip, New York 11722.